U.S. Court of Appeals For the First Circuit
No. 87-353

KATHY KEETON

v.

HUSTLER MAGAZINE, INC.
AND LARRY C. FLYNT

September 23, 1988

*Sheehan, Phinney, Bass & Green P.A.*, of Manchester (*Peter S. Cowan* on the brief), and *Grutman Miller Greenspoon & Hendler*, of New York, New York (*Jeffrey H. Daichman & a.* on the brief, and *Mr. Daichman* orally), for the plaintiff.

*Wiggin & Nourie*, of Manchester (*Gregory A. Holmes* on the brief), and *Cooper, Epstein and Hurewitz P.C.*, of Beverly Hills, California (*David O. Carson* on the brief, and *Alan L. Isaacman* orally), for the defendants.

*Orr & Reno*, of Concord (*William L. Chapman* on the brief) and *Debevoise & Plimpton*, of New York, New York (*John G. Koeltl & a.* on the brief), for The Magazine Publishers of America, as *amicus curiae*.

JOHNSON, J. The United States Court of Appeals for the First Circuit (*Campbell*, C.J.) has certified to us the following questions of law arising out of a multistate libel action:

"1. Does New Hampshire follow an interstate single publication rule in libel cases?

2. If so, does New Hampshire permit a plaintiff to recover for distribution of a libel in jurisdictions whose own statutes of limitations would bar recovery, where neither party is a New Hampshire resident, where the only factual connection with New Hampshire is the distribution there of one percent or less of the total circulation of the material, and where the relevant statute of limitations has expired in every jurisdiction but New Hampshire?"

For the reasons stated below, we answer that New Hampshire follows the single publication rule as formulated by the Restatement (Second) of Torts and that, in the circumstances described, we would apply our own statute of limitations to the plaintiff's entire libel action under that rule.

The facts of the underlying case, as represented by the parties, are briefly these. In October 1980, the plaintiff, Kathy Keeton, brought an action for libel against the defendants, Hustler Magazine, Inc., and its publisher Larry C. Flynt, in the United States District Court for the District of New Hampshire. The action was based on allegedly libelous material appearing in five issues of Hustler Magazine published between September 1975 and July 1976. Keeton had originally brought actions in Ohio in April 1977 for libel and invasion of privacy based on the May 1976 publication. However, the Ohio trial court dismissed the libel action in May 1978 finding that it was barred by Ohio's one-year statute of limitations. In September 1980, the Franklin County, Ohio, Court of Appeals affirmed the trial court's decision to dismiss Keeton's invasion of privacy claim on limitations grounds as well. By this date, the statute of limitations in every jurisdiction except New Hampshire (where the limitations period was then six years) barred Keeton's libel action. She instituted her New Hampshire suit within the month.

In response, Hustler and Flynt filed pre-trial motions to dismiss the New Hampshire action on grounds that included lack of personal jurisdiction, improper venue, and the statute of limitations. These motions resulted in a dismissal on personal jurisdiction grounds, which the United States Supreme Court eventually reversed. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984). On remand, the district court denied the defendants' renewed motions to dismiss on venue and limitations grounds, and the First Circuit refused to grant a writ of mandamus on these issues. Following a 1986 trial, in which the jury awarded Keeton two million dollars,

the defendants again appealed on venue and limitations grounds to the First Circuit, which then agreed to consider the claims.

Keeton, the former associate publisher of Penthouse Magazine, is, and was at all times relevant to this action, a New York resident. Flynt and Hustler were Ohio residents at the time of the publications, but have been California residents since mid-1978. From the time of the libels through the present, Hustler has done business in New Hampshire, distributing between 10,000 and 15,000 copies of its magazine (or about one percent of its total circulation) throughout the State each month. The First Circuit determined that, in the context of a multi-state libel action under the single publication rule that would be barred in every State but New Hampshire, these circumstances presented complex legal questions with potential constitutional implications. Because that Court found that New Hampshire had not yet addressed certain questions of State law relevant to this difficult and novel suit, this certification followed.

## I. *Single publication rule*

We first consider whether New Hampshire should follow the single publication rule in libel cases. Keeton urges us to adopt the rule, citing the benefits it affords plaintiffs, defendants, and the judicial system alike. The defendants do not argue to the contrary, but rather contend, for reasons addressed in part II, that we should not apply the New Hampshire statute of limitations to Keeton's suit for nationwide damages under the rule.

At common law, the multiple publication rule accorded the plaintiff a separate cause of action for each sale or delivery of a copy of the offending publication. *See, e.g., Applewhite v. Memphis State University*, 495 S.W.2d 190, 193 (Tenn. 1973); *Gregoire v. G. P. Putnam's Sons*, 298 N.Y. 119, 122–23, 81 N.E.2d 45, 47 (1948); W. KEETON, PROSSER AND KEETON ON TORTS § 113, at 800 (5th ed. 1984). Under this rule, a defendant was potentially subject to many suits based on distribution of a single edition of a book or magazine; the rule likewise required the plaintiff to bring many suits in order to recover damages in full. *See* RESTATEMENT (SECOND) OF TORTS § 577A comments *c* and *d*, at 209–10 (1977). With the advent of modern-day mass publication, this rule became increasingly burdensome both to the parties and to the judicial system itself. *See Church, Etc. v. Minnesota State Med. Ass'n*, 264 N.W.2d 152, 155 (Minn. 1978); *Applewhite, supra* at 194. The potential number and geographic dispersion of libel suits, coupled with the possibility that they might be based upon distribution over a long period of time,

was particularly burdensome for defendants. *See* RESTATEMENT (SECOND) OF TORTS § 577A comment *b*, at 209. In response, the majority of courts have adopted the so-called single publication rule. W. KEETON *supra.*

The Restatement (Second) of Torts states the single publication rule as follows:

> "(3) Any one edition of a book or newspaper . . . or similar aggregate communication is a single publication.
>
> (4) As to any single publication,
>
>> (a) only one action for damages can be maintained; ·
>>
>> (b) all damages suffered in all jurisdictions can be recovered in the one action; and
>>
>> (c) a judgment for or against the plaintiff upon the merits of any action for damages bars any action for damages between the same parties in all jurisdictions."

RESTATEMENT (SECOND) OF TORTS § 577A. The Uniform Single Publication Act of 1952, 14 U.L.A. 353 (1980), also embodies this rule, and has been adopted by seven States. ARIZ. REV. STAT. ANN. § 12-651 (1982); CAL. CIV. CODE §§ 3425.1 to 3425.5 (Deering 1984); IDAHO CODE §§ 6-702 to 6-705 (1979); ILL. ANN. STAT. ch. 126, paras. 11 to 15 (Smith-Hurd 1987); N.M. STAT. ANN. §§ 41-7-1 to 41-7-5 (1986); N.D. CENT. CODE § 14-02-10 (Supp. 1987); 42 PA. CONS. STAT. ANN. § 8341 (Purdon 1982). A number of other States have adopted the rule by enacting their own statutes or through judicial decision. *See, e.g.,* FLA. STAT. § 770.06 (1987); NEB. REV. STAT. § 20-209 (1983); *Church, Etc., supra; Applewhite supra; Gregoire supra.*

Operation of the single publication rule is perhaps best explained in comment *e* to § 577A of the Restatement:

> "[T]he plaintiff has only one cause of action for the publication. In his single action he may recover damages for the publication to all persons whom the communication has reached or may be expected to reach, whether before or after trial, until its circulation has terminated or the statute of limitations has run against the cause of action. This is true even though the publication has crossed state lines and has been read, heard or seen in every state and in foreign countries; and all damages sustained in all jurisdictions may be recovered in the one action. The purpose of the rule is to include in the single suit all

damages resulting anywhere from the single aggregate publication."

RESTATEMENT (SECOND) OF TORTS § 577A comment *e*, at 210-11. States adopting the rule generally hold, in addition, that the plaintiff's cause of action accrues for limitations purposes on the first date that the publisher releases the finished product for sale. W. KEETON § 113, at 800 and n.34.

■ We recognize the wisdom, in light of modern publishing practices, of adopting the single publication rule as described above. Without the rule, the burden that libel suits would place on parties and the courts might well be intolerable. We therefore join "[t]he great majority of States [that] now follow [the] rule" in libel actions. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. at 777 n.8.

## II. *Statute of limitations*

Because the statute of limitations has run on Keeton's libel claim in every State but New Hampshire, the second certified question essentially asks whether we would preserve that claim by applying our own statute to her entire action. We must therefore determine whether, consistent with New Hampshire choice of law rules and the United States Constitution, we may apply the New Hampshire statute of limitations to Keeton's suit for nationwide recovery under the single publication rule, where neither party is a New Hampshire resident and the defendants distributed approximately one percent of the libel in New Hampshire. We note, at the outset, that we have not been asked whether New Hampshire would apply its own substantive libel law to Keeton's claim, and that we therefore do not address this issue. We add that we cannot now conceive of a case to which we would apply our own substantive law, but a foreign statute of limitations.

Flynt and Hustler argue that we should bar Keeton's claim entirely by refusing to apply our own statute of limitations to any part of her suit. To apply the New Hampshire statute, they say, would ill serve our interests in dismissing stale claims and discouraging forum shopping and would violate the full faith and credit and due process requirements of the United States Constitution. They urge us to apply instead the statute of limitations either of New York (the plaintiff's domicile) or of Ohio or California (the defendants' previous and present domiciles), because each of these States has greater contacts with the claim as a whole than does New Hampshire. In the alternative, they argue that we should, and may, apply our own statute only to that portion of Keeton's

damages attributable to distribution of the libel in New Hampshire. The defendants also argue that Ohio's earlier dismissal of Keeton's suit was a decision on the merits, which bars her further action in another court. We note, however, that we take this argument to present a res judicata question for the federal court.

Keeton argues that there is no constitutional barrier to application of our statute to her entire suit and that this result is consistent with New Hampshire choice of law rules and the interests they are meant to serve. Moreover, she contends, the application of New Hampshire's statute is essential if the single publication rule is effectively to free courts, defendants, and plaintiffs from unnecessarily lengthy and complex litigation.

Neither our own choice of law rules nor the full faith and credit and due process requirements that the United States Supreme Court has enunciated typically require us to apply a statute of limitations other than our own. Both State and federal choice of law requirements traditionally apply only to the forum's choice among substantive rules. *See Allstate Ins. Co. v. Hague,* 449 U.S. 302, 312–13 (1981); *Gordon v. Gordon,* 118 N.H. 356, 387 A.2d 339 (1978). Like a number of other States, New Hampshire treats statutes of limitations as procedural. *Id.* at 360, 387 A.2d at 342.

Although these statutes are traditionally considered procedural, however, a number of courts now apply substantive choice of law principles where forum and foreign limitations periods conflict and foreign substantive law would apply. These courts and some legal commentators argue that the usual justification for applying forum procedures is inapplicable to such statutes. Unlike most procedural rules, they point out, foreign statutes of limitations are relatively easy for courts both to discover and to apply. *See, e.g., Heavner v. Uniroyal, Inc.,* 63 N.J. 130, 136, 305 A.2d 412, 415 (1973); R. WEINTRAUB, COMMENTARY ON THE CONFLICT OF LAWS 50 (1971). As a further reason to abandon automatic application of forum law, commentators note the questionable rationality of applying both the forum's longer statute of limitations and the substantive law of a foreign State that would itself bar the action. *See, e.g., Heavner, supra* at 136–38, 305 A.2d at 415–17; R. LEFLAR, AMERICAN CONFLICTS LAW § 127, at 252–56 (3d ed. 1977); Martin, *Constitutional Limitations on Choice of Law,* 61 CORNELL L. REV. 185, 221 (1976); Comment, *The Statute of Limitations and the Conflict of Laws,* 28 YALE L. J. 492, 496–97 (1919). Thus, it is sometimes suggested that the statute of limitations should be treated as a substantive rule because it is dispositive of the action.

This court has not previously considered whether our traditional approach, which we deem just and desirable in other contexts, would be equally so in the context of a multi-state libel suit governed by the single publication rule. Both the circuit court's certification and the United States Supreme Court's earlier personal jurisdiction decision in this case further suggest that the nature of the single publication rule, coupled with the ongoing debate among courts and legal scholars as to whether statutes of limitations are properly characterized as procedural, raises potential constitutional concerns given the far-reaching effects of applying our statute to Keeton's claim.

■ Although constitutionality remained an open question at the time this case was argued, the United States Supreme Court's recent decision in *Sun Oil Co. v. Wortman*, 108 S. Ct. 2117 (1988), appears to have disposed of this issue. The *Wortman* Court considered the constitutionality of the Kansas Supreme Court's determination that the Kansas statute of limitations was procedural and the State court's consequent application of that statute to claims that were tried in Kansas as part of a class action, but that arose in foreign States, involved foreign parties, and were deemed to be governed by foreign substantive law to which the enacting State would have applied a shorter limitations period. Although the United States Supreme Court specifically refused to express an opinion as to the wisdom of the Kansas court's action, it determined that the decision to treat statutes of limitations as procedural, and therefore to apply the Kansas statute, did not violate the full faith and credit or due process requirements of the United States Constitution. Because *Wortman* thus appears to hold that we may constitutionally treat the statute of limitations as a procedural rule for choice of law purposes, we consider below only whether it is prudent to treat our statute of limitations as procedural, given the peculiarities of Keeton's suit.

A. *New Hampshire Choice of Law Rules*

When New Hampshire is the forum for a suit in which one or more other States also have an interest, we treat potential conflicts of law as follows: we first decide whether a relevant law is substantive or procedural; if it is substantive, we determine whether it actually conflicts with the laws of another interested State; if it is procedural, we generally apply our own law. *Gordon*, 118 N.H. at 360, 387 A.2d at 342. With two exceptions, our courts therefore apply New Hampshire statutes of limitations even when our statutory period differs from that of another interested State

whose substantive law we have chosen to apply. We traditionally apply foreign statutes of limitations in such cases only when such statutes either "extinguish a right, or . . . are an inherent part of a statutory scheme creating a right. . . ." *Gordon supra* (citations omitted).

We choose among substantive laws by applying a balancing test composed of five choice-influencing considerations: "(1) the predictability of results; (2) the maintenance of reasonable orderliness and good relationships among the States in the federal system; (3) simplification of the judicial task; (4) advancement of the governmental interest of the forum; and (5) the court's preference for what it regards as the sounder rule of law." *LaBounty v. American Insurance Co.*, 122 N.H. 738, 741, 451 A.2d 161, 163 (1982); *see Clark v. Clark*, 107 N.H. 351, 353–55, 222 A.2d 205, 208–09 (1966).

■ Like most States, New Hampshire recognizes the elimination of stale or fraudulent claims as the principal purpose of statutes of limitations. *Lakeman v. LaFrance*, 102 N.H. 300, 303, 156 A.2d 123, 126 (1959). Absent such statutes, a dilatory plaintiff might burden a defendant with suits of which he was not timely informed, *Dupuis v. Smith Properties, Inc.*, 114 N.H. 625, 629, 325 A.2d 781, 783 (1974), and clog court dockets, interfering with the "orderly administration of justice," *Wolf Investments, Inc. v. Town of Brookfield*, 129 N.H. 303, 305, 529 A.2d 861, 862 (1987) (quoting *Torr v. Dover*, 107 N.H. 501, 503, 226 A.2d 96, 98 (1967)). Statutes of limitations reflect the fact that it becomes more difficult and time-consuming both to defend against and to try claims as evidence disappears and memories fade with the passage of time. Such statutes thus represent the legislature's attempt to achieve a balance among State interests in protecting both forum courts and defendants generally against stale claims and in insuring a reasonable period during which plaintiffs may seek recovery on otherwise sound causes of action.

We agree that, given these purposes, statutes of limitations do differ from other procedural rules. We further believe, however, that the varied purposes that statutes of limitations are meant to serve justify the application of forum law, and thus the essential treatment of such statutes as procedural rules, in most instances, whether or not our choice of law principles advise application of New Hampshire substantive law.

■ It is, of course, the forum that is best able to decide when claims are so stale that they will burden its dockets, and only the forum has a significant interest in insuring that its dockets are not burdened by such claims. In addition, the forum has an interest in the defendant's protection from stale claims and the plaintiff's pursuit of recovery. We believe that, in any case in which either party is a New Hampshire resident or the cause of action arose in this State, the sum of our above forum interests in applying our own statute, in combination with the benefit of simplification afforded by regular application of our own rule, will tip the choice of law balance in favor of the application of our own limitations period to cases tried here. Thus, in such cases, our courts may typically apply the relevant New Hampshire statute without appeal to our choice-influencing considerations.

Keeton brought suit in New Hampshire to recover for injuries resulting from the defendants' distribution of libelous publications in New Hampshire as well as elsewhere. At the time of her suit, the New Hampshire legislature had determined that the proper balance among relevant interests of the forum, defendants, and plaintiffs supported a six-year statute of limitations for libel, and Keeton properly brought suit for libel within the appointed period. The legislature had not at the time of Keeton's suit (nor has it since) enacted a borrowing statute requiring the application of foreign statutes of limitations under any circumstances. Thus, unlike legislatures in many other States, it had taken no action indicating an absence of any interest on the part of New Hampshire in seeing its own statute of limitations applied to certain categories of suit. Furthermore, relevant foreign statutes do not express the kind of strong local policy concerns that we have traditionally recognized as warranting an exception to the rule that we will apply our own statute. The statutes of limitations in Ohio and California (the two States that might wish to protect domiciliaries) do not extinguish the right to sue for libel and are not "an inherent part of [some] statutory scheme creating [that] right." *Gordon*, 118 N.H. at 360, 387 A.2d at 342; *see* CAL. CIV. PROC. CODE § 340 (Deering Supp. 1988); OHIO REV. CODE ANN. § 2305.11 (Anderson Supp. 1987). The same is true of New York, the plaintiff's domicile. N.Y. CIV. PRAC. L. & R. § 215 (Consol. 1972).

Moreover, there is no indication, based on the peculiar facts of this case, that foreign interests in barring Keeton's claim outweigh forum interests in allowing it. In this regard we first note that foreign States have no reason to fear that application of our longer statute will, in fact, disadvantage the defendants. Because Flynt

and Hustler distributed, in New Hampshire, significant numbers of the libelous publications that gave rise to the injuries for which Keeton sues, they had ample reason to anticipate that Keeton might bring suit against them here to which we would apply our own law. Moreover, Flynt and Hustler do not even allege loss of evidence or other disadvantage resulting from the timing of Keeton's suit.

In comparing our own interest in entertaining Keeton's claims to foreign interests in barring those claims, we first note that where, as here, the forum's limitations period is longer than that of any State whose law is being considered, the forum's interest in protecting its dockets is not so strong as might otherwise be the case. This is because an application of foreign law would not burden forum dockets. However, similar preferences expressed in foreign statutes are entirely irrelevant to the consideration of competing interests since the State expressing those preferences is not the forum.

Although our own interest in striking an appropriate balance between promoting protection for defendants and legitimate recovery for plaintiffs is less great than it would be if defendants or plaintiff were New Hampshire residents, it is nonetheless substantial. As noted above, this is because the defendants distributed, in this State, a significant number of libelous publications giving rise to the injuries for which Keeton sues. The interest that we invariably have in fair treatment of those who are defendants in cases tried here is only increased when the issues to be litigated involve activities those defendants pursued here. Similarly, our general interest in providing plaintiffs sufficient time to bring suit is enhanced when the injuries for which suit is brought were incurred in this State.

Like our own statute of limitations, relevant foreign statutes obviously express what foreign States take to be an appropriate balance among their interests regarding courts, defendants, and plaintiffs. However, it would be nearly impossible for us to discern the weight such States intend to accord these varied interests. We cannot be certain, for example, whether a States' shorter statute of limitations for libel expresses a great concern to protect dockets (which is irrelevant where the State is not the forum) or an enhanced concern to protect defendants from stale claims. So long as our own interests relevant to the choice among statutes of limitations are significant, our additional interest in simplifying the judicial function counsels that we apply our own statute of limitations rather than embark on the highly uncertain task of

discerning precisely what weight a foreign legislature intended to accord the varied interests that statutes of limitations address.

We agree that the single publication rule complicates the analysis here by allowing the plaintiff to recover in any State where she was injured for injuries sustained nationwide. However, we must not allow this peculiarity to blind us to the fact that Keeton was injured in New Hampshire by the distribution of 10,000 to 15,000 copies of a libelous publication. The fact that she had never been in New Hampshire prior to trial does not mean that she suffered no injury here. Indeed, the trial court found her to be sufficiently well known to be considered a "public figure" for purposes of her libel suit. Given both these facts and the ambiguity of the inquiry necessary to determine to what degree a State statute of limitations implicates each of the interests it addresses, it is not apparent to us why Keeton should be prevented from recovery anywhere because three States in which she arguably received greater injury, or which have some additional connection with the parties, have chosen to adopt shorter limitations periods.

In light of the above discussion, we believe that here, as in most cases, all relevant interests are best served by treating our statute of limitations as an essentially procedural rule and applying it to Keeton's action without further discussion. However, even if we were to treat the statute of limitations as a substantive rule, in light of the far reaching consequences of applying our own statute to Keeton's entire claim, our choice-influencing considerations would only provide additional support for the choice of New Hampshire law. There is clearly a conflict among the laws of interested States. At the time of publication, the New Hampshire statute of limitations for libel was six years, while the statutory periods in New York, Ohio, and California (the foreign States most interested in this litigation) were one year. We therefore proceed to analyze the statute in light of our five choice-influencing considerations.

### 1. *Predictability of results*

Predictability of results, the first of our choice-influencing criteria, is usually implicated only in suits involving contractual or similar consensual transactions. *Clark*, 107 N.H. at 354, 222 A.2d at 208. It emphasizes the importance of applying to the parties' bargain or other dealings the law on which they agreed to rely at the outset. There was, of course, no such agreement here. Furthermore, while it is true that a libel defendant can consider the law applicable to potential suits before making the decision to publish, he cannot, in making this decision, legitimately rely on the

potential plaintiff's failure to bring timely suit. That action is entirely in the plaintiff's hands and beyond the defendant's control.

The predictability that results when courts apply the same law wherever suit is brought can also discourage forum shopping among plaintiffs. However, we do not believe that our decision to apply the New Hampshire statute of limitations in this case will significantly encourage unwanted forum shopping in later cases. First, we disagree with the Restatement authors that application of the New Hampshire statute in any way encourages what is typically understood as forum shopping. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 142 (1986 Revisions, Supplement; April 12, 1988, at 8). Forum shopping in the classic sense refers to a plaintiff's attempt to have a court apply the law that will win her the most favorable verdict, not to her attempt to find a forum whose statute of limitations will allow it to entertain her otherwise legitimate suit. *See* BLACK'S LAW DICTIONARY 590 (5th ed. 1979). In addition, our decision to apply our own statute of limitations does not determine what substantive law we would apply. Even the possibility that New Hampshire might apply its own libel law, which is comparatively unfavorable to plaintiffs, would discourage many multi-state libel plaintiffs from instituting suit here. Our first consideration thus provides no strong reason to prefer another statute of limitations to our own.

### 2. *Relationships among the States*

The second consideration, which counsels maintenance of reasonable orderliness among the States, requires only that "a court not apply the law of a State which does not have a substantial connection with the total facts and the particular issue being litigated." *LaBounty*, 122 N.H. at 742–43, 451 A.2d at 164. Unlike cases in which the defendants merely did business in the forum, the injury for which Keeton sues occurred, at least in part, in this State. Moreover, distribution in New Hampshire was far from insubstantial. At the time of the libel, the defendants sold between 10,000 and 15,000 copies of Hustler Magazine in New Hampshire each month.

New Hampshire, of course, was not the sole place of the injury for which Keeton seeks recovery. However, it is implicit in the reasoning underlying the single publication rule that no one State is the sole place of injury in a multi-state libel action. It is the continuity of facts surrounding the production and distribution of many copies of a single publication that justifies courts in treating many separate actions for nationwide injuries as one. While New Hampshire was not the State of greatest distribution, it was

connected with the basic facts necessary to prove the libel through distribution of a significant number of copies. In keeping with the assumptions underlying the single publication rule, New Hampshire's connection with the facts and issues to be litigated was substantial.

### 3. *Simplification*

We have already discussed the fact that simplification counsels us to avoid undertaking the difficult or impossible task of discerning the weights that foreign legislatures have attributed to the interests underlying particular statutes of limitations. We similarly determine that while it might appear to simplify the judicial process to hold that we will regularly apply the statute of limitations of, for example, the plaintiff's domicile to multi-state libel actions, the result in fact would be just the opposite. To depart from our traditional rule by applying a foreign statute of limitations, when concerns other than simplification did not so dictate, would only complicate and confuse New Hampshire conflicts law for the future. We will not adhere blindly to a traditional rule whose application would be unwise or unfair in a particular case, but neither will we depart from a familiar and well-founded rule, absent good reason to do so.

### 4. *Forum interests*

As noted in our discussion of the purposes underlying statutes of limitations and New Hampshire's substantial connection with the facts and issue to be litigated, our interest in applying our own statute to cases generally stems from our concern to insure the orderly administration of our courts and to protect the respective interests of defendants and plaintiffs. Given our inability reliably to discern the weights that other States accord their own interests relevant to the choice among statutes of limitations, we may conclude that there is, in essence, no conflicting foreign interest that outweighs this substantial forum interest.

### 5. *The sounder rule approach*

In addition to forum interests, our decision to apply the New Hampshire statute to Keeton's entire claim is based primarily on our view that this statute reflects the better rule of law.

Particularly in light of State and federal constitutional interests in free speech, our concern is to protect libel defendants by adopting the single publication rule. Nevertheless, we cannot ignore that false statements of fact not only lack constitutional value, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974), but are capable of inflicting substantial injuries, which warrant redress. The single

publication rule does provide plaintiffs with a modicum of protection. It eliminates the necessity of many suits to recover total damages. However, it also significantly limits recovery by requiring that plaintiffs sue not only for past, but also for future damages. This may remove the possibility of later suit against the defendant for republication. *See* RESTATEMENT (SECOND) OF TORTS § 577A comment *d*, illustration 5, at 210.

Because the plaintiff's entire action accrues on the first date of publication, the rule also increases the likelihood that the statute of limitations will run on the plaintiff's claim. As the Court of Appeals for the Second Circuit has recognized, a short statute of limitations may unduly prejudice plaintiffs:

> "In New York, as in most other jurisdictions, the statute of limitations for libel actions is unusually short. To fix as the date of legal publication even the time that the offending matter is placed on sale to the public may create a trap for unwary plaintiffs; magazines are often post-dated several weeks or months after the actual date they are placed on sale to the public . . . . Moreover, under the single publication rule, victims of mass publication libel are given but one action in which to recover for all harm produced by a single edition of a newspaper, magazine, or book. The earlier that sole cause of action must be commenced, the greater the likelihood of post-judgment distributions of the offending material for which the victim is denied any relief whatever."

*Zuck v. Interstate Publishing Corp.*, 317 F.2d 727, 731 (2d Cir. 1963) (footnotes omitted). *But see Novel v. Garrison*, 294 F. Supp. 825–33 (N.D. Ill. 1969) (questioning *Zuck*).

Given the potential prejudice that may result to plaintiffs, we consider that an unusually short statute of limitations for libel is undesirable where a State applies the single publication rule. The better rule, in our view, is a longer statute. This view is consistent with New Hampshire's general preference for decisions on the merits, demonstrated by our comparatively long statutes of limitations for many causes of action, *see, e.g.*, RSA 508:4 (Supp. 1987), and our liberal discovery rule for actions in tort, *see Kirk v. United States*, 604 F. Supp. 1474, 1478–79 (D.N.H. 1985); *Brown v. Mary Hitchcock Memorial Hosp.*, 117 N.H. 739, 743, 378 A.2d 1138, 1140–41 (1977); *Raymond v. Eli Lilly & Co.*, 117 N.H. 164, 170–71, 371 A.2d 170, 173–74 (1977).

We recognize that the legislature's recent enactment of a three-year statute of limitations for libel actions might appear to suggest that the six-year statute was outmoded and should not apply to this case. *See, e.g., Clark*, 107 N.H. at 355, 222 A.2d at 209. However, we do not believe that the change warrants application of a foreign statute. Although the legislature has changed the limitations period, the change places New Hampshire in conformity with States having the longest statutes of limitations for libel. While the six-year statute was unusually long, the legislature's decision does not suggest that we should prefer to it a foreign limitations period so short that it may unduly burden plaintiffs.

■    We also note at this juncture that, contrary to the defendants' suggestion, it would be inconsistent with the goals of the single publication rule to apply our own statute to Keeton's New Hampshire injury alone. If recovery for damages sustained in each State depends, under the single publication rule, on whether or not its statute of limitations would bar the action, there appears to be no reason why each State's substantive libel law should not also apply to injuries occurring in that State. However, this would present courts and juries with the formidable, if not impossible, task of applying the law of each State to the injury there sustained. Such a result would significantly burden courts, plaintiffs, and defendants. The single publication rule treats what were formerly many actions and injuries as one in order to simplify suits and protect parties. In adopting and applying the rule, we will act consistently with these purposes by choosing a single statute of limitations applicable to a single cause of action. We take this to be the better approach to resolving conflicts of law in suits under the rule.

■    We therefore conclude not only that the combination of our forum interests and our interest in simplification counsel application of our statute in this as in most cases, but that a full-blown analysis based on our five choice-influencing considerations would provide ample further support for this conclusion. We emphasize that we would not anticipate requiring a choice-influencing analysis in any case in which this State was either the domicile of one of the parties or the place where the cause of action arose. Moreover, we make no decision regarding cases with which our connection is less substantial. Such cases must await our opportunity to consider the relevant issues based on a particular set of facts.

■ In reaching our decision, we do not, of course, determine that other States are not substantially interested in this litigation. Certainly they are, and for just the reasons that the dissent cites. However, the absence of clear reason to believe that a relevant foreign statute of limitations expresses foreign interests in barring the action that outweigh our own interests in entertaining it counsels application of our own law, particularly in light of the simplification that this outcome affords. When viewed in combination with our understanding of the better rule of law, our reasons for applying our own statute in this complex case are only strengthened.

*Remanded.*

SOUTER, J., with whom THAYER, J., joined, dissented; the others concurred.

SOUTER, J., dissenting: Based on libels published in issues of *Hustler* magazine and circulated throughout the United States, a New York plaintiff has obtained an award of damages in the United States District Court for the District of New Hampshire against both a publishing corporation, whose principal place of business was Ohio at the time of the publication and is now California, and the magazine's publisher, whose residence has followed the corporation. The defendants have appealed. The United States Court of Appeals for the First Circuit has sought our opinions on whether the trial court properly understood New Hampshire libel law to include a single publication rule, and whether, in effect, the court was correct in applying New Hampshire's statute of limitations, which at the time of the publications in this case provided a six-year limitation period for bringing libel actions. *See* RSA 508:4 (amended by Laws 1981, 514:1 to provide a three-year period for causes of action in defamation arising after its effective date; *see id.,* § 2).

I join with the majority to the extent of their holding that in a proper case New Hampshire's domestic law of defamation should include a single publication rule for the redress of multistate dissemination of defamatory material. Since we have not been asked to decide whether New Hampshire's substantive law of libel should be applied in this case, there is no occasion to say anything more about the application of this holding to the facts before us.

As we understand the First Circuit's second question, however, we have been asked to determine whether it was proper to apply New Hampshire's statute of limitations on the instant facts, and I must respectfully dissent from the majority's affirmative answer.

Although the majority conclude that New Hampshire's statute applies because "[i]t is . . . the forum that is best able to decide when claims are so stale that they will burden its dockets," they thereby fail to account for the distinctive flavor of the case. For what renders the issue before us so provocative is that the non-resident plaintiff has availed herself of a forum in New Hampshire to collect damages from non-resident defendants for libel in fifty States and the District of Columbia, even though more than ninety-nine percent of the libelous magazines were circulated outside New Hampshire in jurisdictions whose own statutes of limitations, if applied, would all have barred the litigation as untimely.

Because, then, the plaintiff came to this district and jurisdiction only because she had no place else to go, it is no wonder that the comment accompanying the American Law Institute's most recent proposal for revising the Restatement (Second) of Conflict of Laws § 142 (1986 Revisions, Supp.: April 12, 1988) has described the case before us as an "egregious example[ ] of forum shopping." *Id.* at 8; *see also Keeton v. Hustler Magazine, Inc.*, 682 F.2d 33, 35 (1st Cir. 1982). And while a plaintiff is free to shop for an uncommonly advantageous forum if the forum is open to shopping, *see Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 779 (1984), it is a practice this court has not previously hesitated to condemn as an evil, *see Clark v. Clark*, 107 N.H. 351, 354, 222 A.2d 205, 208 (1966), and one we should hardly promote today without some strongly countervailing justification. The astonishing result of the majority's decision is, therefore, enough to call for a critical look at the reasoning they employ.

Their holding is the product to two related rules. The first is that in litigation implicating the interests of more than one State and requiring choices of law to be made, procedural issues are to be resolved by the law of the forum State. Under the second, a statute of limitations is characterized as procedural, so that the statute of the forum State should customarily be applied.

I am aware of no objection to the first rule, and I raise no quarrel with it myself. Although choice-of-law questions should be decided on the basis not of mechanical rules but of "relevant choice-influencing considerations," *id.* at 353, 222 A.2d at 208; *see* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1971); *see infra*, applying the procedural law of the forum normally serves the legitimate objective of simplifying the judicial task, *Clark v. Clark*, *supra* at 354, 222 A.2d at 208, which is a sufficient justification, *id.* Managing New Hampshire discovery by reference to Colorado's

deposition practice, or conducting New Hampshire trials under New Mexico's law of evidence, would invite chaos.

The second rule, however, that the limitation of actions is a matter of procedure to be governed by the statute of the forum, is troublesome. Right on the face of it, a limitation statute is obviously distinguishable from such paradigm procedural examples as rules regulating service of process, the deposition of witnesses, or closing arguments of counsel. Whereas these latter rules prescribe how to prepare a case and conduct a trial once action has been brought, a statute of limitations determines whether an action can be maintained at all. And although the application of any procedural rule may have the potential to influence the outcome of a case, the application of a limitation statute can have a direct and dispositive effect, which garden-variety rules of procedure cannot claim for themselves. There is, then, nothing inherently persuasive in characterizing such a statute as merely procedural. *See Guaranty Trust Co. v. York*, 326 U.S. 99, 108–09 (1945); Sedler, *The Erie Outcome Test as a Guide to Substance and Procedure in the Conflict of Laws*, 37 N.Y.U. L. REV. 813, 821–23, 846–50 (1962).

Nor is there anything persuasive in the reasoning of our prior cases that have so held. Even though the rule's application long antedates our adoption of the *Clark* structure, identifying choice-influencing considerations for deciding conflicts questions, it is remarkable how little reasoning of any sort appears in the cases that have preserved the old rule to this day. *Gordon v. Gordon*, 118 N.H. 356, 360, 387 A.2d 339, 342 (1978), upon which the plaintiff relies, does no more than cite prior cases for the conclusion that a limitation statute is procedural unless it "extinguish[es] a right" or is "an inherent part of a statutory scheme creating a right." *Id.* (citations omitted). The prior cases in point lead back finally to *Smith v. Turner*, 91 N.H. 198, 199, 17 A.2d 87, 87 (1940) and *Connecticut &c. Co. v. Railroad*, 78 N.H. 553, 557, 103 A. 263, 265 (1918), each of which indicated that a foreign statute of limitations would not be an appropriate choice of law in a conflicts case if it "relate[d] merely to the remedy and [did] not obliterate the right." *Id.* On this reasoning, then, the usual sort of limitation statute was thought to be procedural, because it governed the remedy by which redress was obtained, rather than the right to obtain the redress itself.

The description of a limitation period as affecting remedy rather than right is specious, however. It is true, of course, that limitation rules characteristically have different origins from the causes of action to which they apply, the one normally being statutory, the

other common law. It is, however, equally true in the practical world served by the law that a plaintiff is concerned with a right only insofar as it may be asserted as a right of action, and a right of action endures entirely at the sufferance of the defendant who can demonstrate an expired limitation period. Thus, the most that can be said for drawing any right-remedy distinction in this context is that the elements of causes of action in tort and contract do not customarily require a plaintiff to plead and prove in the first instance that the litigation is timely, and a defendant who would rely on a plaintiff's untimeliness must plead the expired limitation period as an affirmative defense. *See Barnard v. Elmer*, 128 N.H. 386, 388, 515 A.2d 1209, 1211 (1986); *Yeaton v. Skillings*, 100 N.H. 316, 320, 125 A.2d 923, 926 (1956). But there is no significance in this. Exactly the same thing is true, for example, when a defendant seeks to plead self-defense to an assault charge, *see, e.g., Tucker v. State*, 89 Md. 471, 482, 43 A. 778, 782 (1899); *see also* R. WIEBUSCH, 4 NEW HAMPSHIRE PRACTICE, CIVIL PRACTICE AND PROCEDURE § 282, at 192–93 (1984), but no one would seriously suggest that the law of self-defense is merely remedial or procedural, and not substantive. Just as pleading and proof of self-defense can make the difference between a plaintiff's and a defendant's verdict, so here the opportunity to plead and prove the expiration of another State's limitation period will make the difference between two million dollars and zero. This effect cautions against relying on a nominal distinction between right and remedy to immunize conflicts among limitation rules from the kind of analysis on the merits that informs choices of law when substantive rules conflict. Because, indeed, the statute of limitations can function as such a dispositive defense, the fallacy of dismissing it as merely remedial is just as clear now as it was twenty years ago, when Professor Leflar mildly observed that a right without a remedy is not much of a right. R. LEFLAR, AMERICAN CONFLICTS LAW § 127, at 304 (1968).

How is it, then, that a court whose 1966 *Clark* decision embraced Professor Leflar's approach to conflicts problems nonetheless adopted a *Gordon* decision in 1978 adhering to the unsupportably mechanistic rule that the procedural character of a statute of limitations issue always requires its application as the forum's law? Certainly in the immediate aftermath of *Clark* there did not seem to be any question that a conflict between limitation laws was just as much deserving of a *Clark* analysis as a conflict on any concededly substantive issue, and the federal courts in this circuit saw the applicability of *Clark* to such a question. *See Dindo v.*

*Whitney,* 429 F.2d 25, 26 (1st Cir. 1970); *Seymour v. Parke, Davis & Co.,* 294 F. Supp. 1257, 1263 (D.N.H. 1969).

The answer is that the *Gordon* court ignored *Clark* in holding limitations to be procedural, probably because counsel to the parties in *Gordon* ignored it. Indeed, the briefs in that case reveal that the parties apparently never even joined issue, before this court, on the question of which State's statute of limitations should be applied. The appellee's brief did not address the point at all, and a court may perhaps be forgiven for slighting a matter with which counsel seemingly never came to grips.

Today's majority can claim no such extenuation, however. The issue is squarely joined, the *Gordon* rule is manifestly devoid of reasoned support, and four sources of persuasive authority counsel for the repudiation of *Gordon* so as to make way for the application of *Clark* to the issue before us.

The first group of authorities ranged against the majority's position are legislative enactments in some 35 States of so-called borrowing statutes, eliminating in differing degrees the assumption that the forum's limitation period ought generally to be applied. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 142 (1986 Revisions: April 15, 1986), at 181–82. The provisions of borrowing statutes vary widely and not all would apply to defamation actions, *id.,* but such statutes typically provide for the application of some other State's period of limitation to an action that arose outside the forum State. *See* E. SCOLES AND P. HAY, *Conflict of Laws* § 3.11, at 62 (1984). What is significant here is not the result that such a statute would achieve in a multistate defamation action (which, in New Hampshire, might still require a *Clark* analysis to determine the appropriate limitation), but the indication of how outmoded the majority's view has become as States have taken steps to preclude the forum shopping that taints this case.

There is, second, the position taken by the overwhelming body of commentators, ranged against mechanical application of the forum's statute of limitations as merely procedural. *See, e.g.,* A. EHRENZWEIG, CONFLICT OF LAWS § 160, at 428 (1962); H. GOODRICH, CONFLICT OF LAWS § 85, at 152 (4th ed. 1964); R. LEFLAR, AMERICAN CONFLICTS LAW § 121, at 239 (3d ed. 1977); E. SCOLES AND P. HAY, CONFLICT OF LAWS § 3.12, at 65 (1984); R. WEINTRAUB, COMMENTARY ON THE CONFLICT OF LAWS § 3.2C2, at 59 (2d ed. 1980); Cook, *"Substance" and "Procedure" in the Conflict of Laws,* 42 YALE L.J. 333, 343–44 (1933); Comment, *Choice of Law: Statutes of Limitation in the Multistate Products Liability Case,* 48 TUL. L. REV. 1130, 1135 (1974); Ester, *Borrowing Statutes of Limitation and Conflict*

*of Laws*, 15 U. FLA. L. REV. 33, 36–39 (1962); Grossman, *Statutes of Limitations and the Conflict of Laws: Modern Analysis*, 1980 ARIZ. ST. L.J. 1, 15–33, 38–43, 64–65 (1980); Leflar, *The New Conflicts-Limitations Act*, 35 MERCER L. REV. 461 (1984); Lorenzen, *The Statute of Limitations and the Conflict of Laws*, 28 YALE L.J. 492, 496–97 (1919); Martin, *Statutes of Limitations and Rationality in the Conflict of Laws*, 19 WASHBURN L.J. 405 (1980); McDonnold, *Limitation of Actions—Conflict of Laws—Lex Fori or Lex Loci?*, 35 TEX. L. REV. 95, 112 (1956); Milhollin, *Interest Analysis and Conflicts Between Statutes of Limitations*, 27 HASTINGS L.J. 1 (1975); Note: *An Interest-Analysis Approach to the Selection of Statutes of Limitation*, 49 N.Y.U. L. REV. 299, 300–03 (1974); Reese, *The Second Restatement of Conflict of Laws Revisited*, 34 MERCER L. REV. 501, 505–07 (1983); Sedler, *The Erie Outcome Test as a Guide to Substance and Procedure in the Conflict of Laws*, 37 N.Y.U. L. REV. 813, 847 (1962).

With seventy years of writing by thoughtful opponents of the majority's position, and champions of my own, it is difficult to limit quotations to the few that follow.

> The entrenchment of the *lex fori* rule is "neither justifiable by common law tradition, nor by modern rationalizations." A. EHRENZWEIG, *supra* at 429.

> "It has never been satisfactorily shown why a suit should be permitted if it cannot be maintained under the law to which the forum looks as a model. . . . The struggles of the courts to determine whether the locus has destroyed the right [under the traditional view] are amusing, even if the results are inconsistent and the reasoning at times most specious." Sedler, *supra* at 847–48 (footnote omitted).

> "There is no inherent reason why the choice between statutes of limitations should be handled any differently than other choice-of-law problems." R. LEFLAR, AMERICAN CONFLICTS LAW, *supra* at 256 (footnote omitted).

> "By mechanically mandating application of the statute of limitations of the forum, the *lex fori* rule fails to serve any of the [purposes of the time bar]. . . . When plaintiff's cause of action is barred at the forum which is most appropriate for hearing the suit and most convenient for the parties, plaintiff is encouraged to engage in forum-shopping by seeking a jurisdiction with a longer time bar. . . . As a result, the rule increases case loads . . . by inviting suits

barred in other jurisdictions. Moreover, by encouraging such suits the forum unwittingly solicits older cases in which the evidence is more likely to be 'stale.' Finally, because the rule permits a dilatory plaintiff to utilize the statute of limitations of any jurisdiction in which the defendant can be served with process, the defendant is denied a definitive indication as to when his potential liability has expired.

. . . Thus, the mechanical simplicity of the *lex fori* rule, based on the fiction that the statute of limitations is a procedural matter, undermines the principal aims of conflicts doctrine and frustrates the legislative purposes which underlie statutes of limitation." Note, *An Interest-Analysis Approach to the Selection of Statutes of Limitation*, *supra* at 302–03 (footnotes omitted).

"[The modern view] seems clearly correct and has the further advantage of obviating the need for a court to determine whether a foreign statute of limitations bars the right and not merely the remedy. It puts an end not only to a bad rule but also to the artificial and equally bad exception to the rule that the courts created." Reese, *supra* at 507.

Third, there are the judicial rejections of the wooden procedural classification in favor of some variety of contemporary conflicts analysis, by courts less immune than today's majority to the criticism I have cited and quoted. *See Perkins v. Clark Equipment Co., Melrose Div.*, 823 F.2d 207, 209 (8th Cir. 1987) (North Dakota Law); *Ledesma v. Jack Stewart Produce, Inc.*, 816 F.2d 482, 484 (9th Cir. 1987) (California law); *Tomlin v. Boeing Co.*, 650 F.2d 1065, 1070 (9th Cir. 1981) (Washington law); *Schum v. Bailey*, 578 F.2d 493, 495–98 (3d Cir. 1978) (New Jersey law). *But see Warner v. Auberge Gray Rocks Inn, Ltee.*, 827 F.2d 938, 940–43 (3d Cir. 1987). *See Jenkins v. Armstrong World Industries, Inc.*, 643 F. Supp. 17, 24–26 (D. Idaho 1985); *Farrier v. May Department Stores Company, Inc.*, 357 F. Supp. 190 (D.D.C. 1973). *But see Manatee Cablevision Corp. v. Pierson*, 433 F. Supp. 571, 572–74 (D.D.C. 1977). *See Bates v. Cook, Inc.*, 509 So. 2d 1112 (Fla. 1987); *Myers v. Government Employees Ins. Co.*, 302 Minn. 359, 225 N.W.2d 238 (1974); *Heavner v. Uniroyal, Inc.*, 63 N.J. 130, 135–41, 305 A.2d 412, 415–18 (1973); *Myers v. Cessna Aircraft Co.*, 275 Or. 501, 515–16, 553 P.2d 355, 367 (1976); *Central Mut. Ins. Co. v. H.O., Inc.*, 63 Wis. 2d 54, 64–67, 216 N.W.2d 239, 244–45 (1974); *White v. Malone Properties,*

*Inc.*, 494 So. 2d 576, 581–83 (Miss. 1986) (Robertson, J., concurring); *Baldwin v. Brown*, 202 F. Supp. 49, 51 (E.D. Mich. 1962) (alternate basis); *cf. Kenney v. Trinidad Corporation*, 349 F.2d 832, 839 (5th Cir. 1965), *cert. denied*, 382 U.S. 1030 (1966); *Brandler v. Manuel Trevizo Hay Co.*, 154 Ariz. App. 96, 97–100, 740 P.2d 958, 959–62 (1987). The author of the American Law Institute's pamphlet to which I referred above has characterized the cases rejecting the old rule as "represent[ing] the emerging trend." *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 142 (1986 Revisions, Supp.: April 12, 1988), at 4.

Fourth, there are the drafters of the Restatement, who are proposing to supersede the old view of limitations as procedural, *see* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 142 (1971), with a provision calling for an ultimate appeal to interest and relationship analysis in resolving a conflict between limitation rules. *See* 1986 Revisions, Supp.: April 12, 1988, at 1. The most recently proposed draft would provide that

> "(2) [t]he forum will apply its own statute of limitations permitting the claim unless:
>
> (a) maintenance of the claim would serve no significant interest of the forum; and
>
> (b) the claim would be barred under the statute of limitations of a state having a more significant relationship to the parties and the occurrence."

*Id.* When and if this provision, or something like it, is adopted by the American Law Institute, its application will often, if not always, produce the same conclusion that we would reach on a *Clark* analysis.

The majority, of course, claim to have done a *Clark* analysis, and to have reached the same result on the basis of "relevant choice-influencing considerations" that they previously reached on the basis of *Gordon*. It is, however, surprising to conclude as the majority do that New Hampshire, which received less than one percent of the libelous publications' circulation and experienced virtually no other contact with the parties, has an interest in either the parties, the events, or the litigation that justifies the application of its law as against the law of all other interested States. I respectfully submit that analysis following the *Clark* methodology will not support such a conclusion.

*Clark* described five considerations to be addressed in making a choice of law: "(1) predictability of results; (2) maintenance of reasonable orderliness and good relationship among the States in

our federal system; (3) simplification of the judicial task; (4) advancement by the court of its own state's governmental interests rather than those of other states; (5) the Court's preference for what it regards as the sounder rule of law, as between the two competing ones." *Doiron v. Doiron*, 109 N.H. 1, 3, 241 A.2d 372, 373 (1968); see *Clark v. Clark*, 107 N.H. at 354–55, 222 A.2d at 208–09; Leflar, *Choice-Influencing Considerations in Conflicts Law*, 41 N.Y.U. L. REV. 267, 282–304 (1966). I will address them in order, as of the time the plaintiff brought her action.

(1) The value of predictability is not to be confined to cases for the enforcement of consensually derived obligations. As Professor Leflar has explained, "[p]redictability of results includes the ideal that the decision in the litigation on a given set of facts should be the same regardless of where the litigation occurs, so that 'forum shopping' will benefit neither party." *Id.* at 282–83. Further argument is unnecessary to demonstrate the forum shopping represented by this case; the plaintiff, indeed, does not even suggest that New Hampshire's limitation period would have been applied if she had brought action in any of the jurisdictions where the local limitation period had run. Her forum shopping, then, has brought the benefit of a verdict for multistate damages that are absolutely time-barred under the laws of those jurisdictions in which ninety-nine percent of the tortious pulications were circulated. Viewed, therefore, under the heading of predictability, a choice of New Hampshire law could not be less appropriate, except on the assumption that no publication whatever occurred in New Hampshire, the facts otherwise being the same.

(2) The need for comity within the federal system behooves the forum to consider application of the relevant law of other jurisdictions whose substantial concerns with the problem at hand give them interests in the application of their respective laws. Although such interests are not, as such, determinative of the choice of law, they are appropriate subjects of consideration, *id.* at 287, to be weighed with all other relevant factors.

The jurisdictions with obvious claims to assert interests derived from relationships with the parties or the publication are Ohio, California, and New York. Ohio and California may be taken together as the place of the defendant's business or residence, as a result of which those States gain interests in limiting the duration both of the defendants' financial exposure and of the jeopardy to free expression that a long limitation period visits on a publisher. *See* Note, *The Choice of Law in Multistate Defamation—A Functional Approach*, 77 HARV. L. REV. 1463, 1467 (1964)

(hereinafter, "Note, *Functional Approach*"). These States thus have a collective interest in the enforcement of their shorter, one-year limitation periods. *See* CAL. CIV. PROC. CODE § 340 (Deering Supp. 1988); OHIO REV. CODE ANN. § 2305.11 (Anderson Supp. 1987).

New York's interest derives from the plaintiff's residence there, from which we may infer, in the absence of any contrary indication, that New York was the State where the plaintiff was best known at the times of the publications, and where she enjoyed the greatest number of those business and social relationships that were found to have been affected by the defamatory materials in question. Thus, New York's significant relationships with both the plaintiff and the defamation give rise to that State's general interest in the application of its own law, which includes a one-year limitation period. *See* N.Y. CIV. PRAC. L. & R. § 215 (McKinney Supp. 1988).

While it is true that New York may have no interest in limiting the plaintiff's opportunity to bring action elsewhere, its one-year statute also indicates that it lacks any interest in supporting the plaintiff's claim to benefit from the longer period that New Hampshire's statute would allow. By a parity of reasoning, the identity of New York's one-year period with the one-year periods common to Ohio and California means that among the three States there is no conflict of laws, and thus no occasion to view New York's interest as running counter to the interests of Ohio and California. There is therefore no reason here to question a conclusion reached in Note, *Functional Approach, supra* at 1472, that the State of a publication's editorial office has the strongest interest in the application of its law, when the publication is sued for multistate libel. The need for comity, then, calls for consideration of this interest and the application of a one-year period.

(3) On the third subject, the simplification of the judicial task, there is not much to be argued one way or another. While nothing could be easier than applying the forum's statute of limitations, no subject of foreign law could probably be ascertained with greater ease than a limitation period.

(4) Concern for the advancement of the interests of New Hampshire as the forum State calls for an enquiry into three possible sources of State interest: the State's relationship to the parties, the effects of the publications in New Hampshire, and the very fact that the New Hampshire legislature saw fit to enact its statute of limitations as one element in the State's system of

justice. As references to the facts of this case have already indicated, New Hampshire has no interest derived from a relationship with any of the parties, since they have had virtually no contacts with the State apart from this litigation in a federal court. The defendants' connections with the State apparently depend entirely on the mail service, or independent magazine distributors, which together at the relevant time conveyed less than one percent of *Hustler's* circulation into New Hampshire. The plaintiff's contacts are even less significant. The First Circuit's earlier opinion informs us only that her name has appeared as an officer of *Penthouse* magazine and as an editor of two others, copies of which were distributed in the State, and a citation to the record indicates that she never set foot in New Hampshire prior to the trial itself. The State, then, can claim no interest in protecting either party, derived from personal associations. Although the State may still claim some interest in protecting the reputation of a non-resident, *see Keeton v. Hustler Magazine, Inc.*, 465 U.S. at 777, there is no reason to believe that such an interest rises above the minimal level in this case.

Nor do the effects of the publications give rise to any significant State interest. The record before us contains no indication that any appreciable number of New Hampshire people had ever heard of the plaintiff at the time of the publications, let alone that they held her in any definite repute. Hence, any actual damage suffered because of the New Hampshire circulation was almost certainly smaller in proportion to the whole of her damages than even the percentage of *Hustler's* total circulation distributed in this State. Indeed, the State's sole and tenuous interest arising from the publication itself would seem to have been a concern, as described in *Keeton v. Hustler*, 465 U.S. at 776, to protect its citizens from misinformation about a little-known outsider.

All that is left as a possible source of serious State interest in applying its own former limitation rule is, then, the State policy that was expressed in the rule itself. Statutes of limitations embody a dual policy against subjecting defendants to the trial of stale claims and against wasting the courts' time in their litigation. Specifically, New Hampshire's prior policy was one against litigating libel claims older than six years, subject to exceptions not relevant here. If, therefore, a plaintiff were to importune a New Hampshire court to recognize another State's limitation period that was longer than six years, the plaintiff could not prevail consistently with New Hampshire policy, and

this State would have a genuine interest in asserting its own six-year statute. There is no such inconsistency of policy, however, when these defendants argue for the application of the one-year period common to the other three interested States, since the one-year period can be applied without in any way compromising this State's interest in avoiding the litigation of claims older than six years. *See* Note, *Functional Approach, supra* at 1473. That is to say, the policy underlying New Hampshire's six-year limitation period is a policy against litigating claims over six years old, not a policy calling affirmatively for the litigation of all claims under that age. Thus, there simply is no conflict as between the policies and interests of New Hampshire and those of the other three States. *See* R. LEFLAR, AMERICAN CONFLICTS LAW § 93, at 187 (3d ed. 1977).

I do not, of course, mean to conclude here that the State could never have an interest in applying its statute of limitations in a multistate action between non-residents. If for example, the plaintiff were well known here and her activities in this State were the subject of libelous disparagement, New Hampshire's position might bear some analogy with the State of a plaintiff's residence. Nor do I mean to intimate here how I would decide a non-resident plaintiff's request to apply the New Hampshire statute for the sake of allowing recovery solely of damages attributable to that portion of a multistate publication that occurred in New Hampshire.

On the facts of this case, however, New Hampshire has no genuine interest in the enforcement of its statute. But even that does not exhaust the issue, for thus far my analysis has not focused on the actual consequence that follows from the majority's view that the New Hampshire statute should apply. As we have already seen, that consequence is, in effect if not in theory, nothing less than the revival of defamation actions that are dead under local law in every other jurisdiction of the United States. The revealing question, then, is not merely whether this State has an interest in applying its local rule, but whether it has an interest in encouraging defamation claims that are time-barred everywhere else to end up in New Hampshire for trial. The answer is no.

(5) Finally, considering a preference for the better rule forces us to make some judgment about the soundness of New Hampshire's old six-year statute. Only under New Hampshire law could this action have been brought, and in judging the wisdom of our former rule we may well ask whether they were all out of step

but Jim. Actually, the New Hampshire legislature acknowledged as much in 1981 by shrinking the limitation period to three years, *see* RSA 508:4, II, which, if applicable, would have barred this action. Nor is the legislative judgment hard to defend as a step in the right direction, there being good reason to prefer a shorter period over a longer one in defamation cases. While the essence of defamation is described as harm to reputation, *see* W. KEETON, PROSSER AND KEETON ON TORTS § 111, at 773 (5th ed. 1984); RE-STATEMENT (SECOND) OF TORTS § 559 (1977), the damage consists of interference with the various advantageous relationships actually or potentially existing between the plaintiff and others in society. Because such harm by its very nature is demonstrable with less certainty than damage to a fender or injury to a collarbone, there is a strong social interest in requiring allegations of defamation to be proven sooner rather than later after the wrong is said to have occurred. Thus, defamation claims may be thought to go stale faster than other tort claims do. *See In Re Value Line Special Situations Fund Lit.*, 420 F. Supp. 125, 128 (S.D.N.Y. 1976). On this premise, New Hampshire's six-year statute was anomalous, and the one-year periods of each of the other three arguably interested States expressed a patently better rule.

Where these considerations balance out is clear. New Hampshire's six-year statute was an undesirable anomaly, the application of which is unjustifiable for the sake of simplicity or for the achievement of any other purpose recognized in the *Clark* catalog. Other States with obviously more significant contacts with the parties, the publications, and the resulting harm agree in providing a one-year period of limitation. New Hampshire's interest in correcting misinformation about non-residents obviously does not demand a six-year opportunity for such a process, and application of a one-year rule would not thwart the policy served by New Hampshire's old six-year statute. Nor, finally, does New Hampshire have any interest in providing a final resort for litigating damage claims that are moribund in every other jurisdiction, thereby eliminating the possibility of predictable results in the aftermath of multistate defamation, and inviting the ultimate forum shopping that has occurred in this case.

I cannot, therefore, agree that the application of New Hampshire's statute of limitations is neither arbitrary nor unfair, as the majority insist, and I would answer the First Circuit's second question in the negative, for the reason that New Hampshire's

limitation period may not properly be applied in this case. Given that answer, I have no occasion to comment on the constitutional analysis contained in the majority opinion.

THAYER, J., joins in the dissent.